UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Antonio Estrada,<br>    *Plaintiff*,<br><br>        *v.*<br><br>Maximo Torres,<br>    *Defendant*. | Civil No. 3:07cv1683 (JBA)<br><br><br><br>July 24, 2009 |

RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. # 20]

Plaintiff Antonio Estrada, a diabetic man subject to hypoglycemia, brings suit against Maximo Torres, a Police Officer with the Waterbury Police Department, in connection with Officer Torres's arrest of Mr. Estrada outside a supermarket in Waterbury, Connecticut. Plaintiff brings claims pursuant to 42 U.S.C. § 1983 for false arrest, malicious prosecution, and excessive force under the Fourth Amendment and denial of proper medical care under the Due Process Clause of the Fourteenth Amendment. Following discovery, Defendant moved for summary judgment on the Fourth Amendment claims. For the reasons stated below, Defendant's motion will be granted. Plaintiff's claim for denial of proper medical care remains for trial.

I.     Background

The parties agree on the following facts: On October 2, 2005, Plaintiff and his brother, Joselito Estrada, were shopping at a Shaw's Supermarket in Waterbury, where Defendant "was working an extra duty assignment." Plaintiff tried on sunglasses, including one with a "grade" of 250, and as he waited in line to purchase a lottery ticket he "pulled off

the sticker that said '250' (the grade of the glasses) and tried the glasses on again." Plaintiff put the glasses in his back pocket when he reached for his wallet to pay for the lottery ticket, and "then exited the store, without paying for the eyeglasses." Defendant watched these events transpire in real-time via the store's closed-circuit security cameras after being called by Shaw's security manager Tiffany Tenner. When Plaintiff felt the glasses in his pocket as he sat down in Joselito's car, he "took [them] out of his rear pocket and straightened the glass frame because it was slightly bent[,] . . . tried the glasses on to see if they still fitted him well[,] . . . tried reading the cashier's receipt with the eyeglasses on[,] and found that the glasses suited his vision and he could read the receipt okay." Immediately thereafter, Office Torres "approached Mr. Estrada at his car and Mr. Estrada was taken into custody and escorted to the security office inside the store," after which Defendant "arrested Mr. Estrada on a charge of Larceny in the Sixth Degree." (Def.'s Rule 56(a)1 Stmt. [Doc. # 20-2] at ¶¶ 1–15; Pl.'s Rule 56(a)2 Stmt. [Doc. # 21-1] at § A (admitting these statements).)

Mr. Estrada relies primarily on his own sworn discovery responses and on a February 2006 letter he wrote to his psychiatrist, Dr. Efren E. Rebong, about this incident.[1] In these documents Plaintiff asserts that he is diabetic and had begun "feeling mild symptoms of hypoglycemia" while waiting to pay for the lottery ticket and before pulling off the sticker. As Plaintiff's symptoms increased in severity "[i]t seem[s] [he] panicked and [was] a bit

---

[1] Defendant has not objected to Plaintiff's reliance on the letter, and in fact has "waived any objections to the admissibility of the [letter] by offering [it] [himself]." *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005).

2

confused," whereupon he left the store, found his brother near their car, "told him [he was] having hypoglycemia," and sat down in the car to "open[] the console where [he] keep[s] [his] insta-glucose and chocolates and regular soda." When he sat down he "realized that [he] walked out of the store without paying for the glasses." He then tried them on, "[b]ut before [he] could tell [Josel]ito to go back to the store and pay for" the glasses, Defendant (whom Mr. Estrada calls "the security guard") asked him to exit the car, "handcuffed [him], and led [him] to the store[']s security room," patted Plaintiff down and questioned him inside the supermarket's security office. (Letter to Dr. Rebong, Ex. B to Pl.'s Rule 56(a)2 Stmt., at 1–3; Pl.'s Discovery Responses, Ex. A to Pl.'s Rule 56(a)2 Stmt.) According to Plaintiff:

> In the security room I was told to spread my legs and patted on, searching and emptying my pockets of all its contents (my wallet, cell phone, keys [and] coins). [Officer Torres] counted the money in my wallet, checked my cards and even the spare key for my car. . . . I was held in detention for almost an hour standing with handcuffs being yelled at and screamed at by [Ms. Tenner]. By that time I'm already experiencing mild to moderate hypoglycemia [in] my toes, feet and hands were hurting because of neuropathy. . . . When I told [Office Torres] that my hands were hurting and feels like the handcuffs were feeling tight he lifted my hands/arms on my back which was painful[], he also yanked up my pants 2x that hurts my groin area.

(Letter to Dr. Rebong at 2–3.) In his deposition Plaintiff explained that the "excessive force" to which he was subject included Officer Torres "pulling my pants about five times," which "hurts my groin." (Pl.'s Dep. at 52:2–3.) Defendant does not rebut Plaintiff's recitation of these facts.

Plaintiff further states that in the presence of Defendant both Plaintiff and his brother informed Ms. Tenner (whom Mr. Estrada calls "the security officer") that he was having a hypoglycemic attack.  Plaintiff wrote to his psychiatrist that while Defendant took Plaintiff to the Shaw's security office "[Josel]ito kept on telling the security guard that I'm having hypo. and telling them to be careful with me."  (Letter to Dr. Rebong at 2.)  In his discovery responses Plaintiff states that he told Defendant "that I was having a seizure and that I was having a hypoglycemic attack.  I was pleading to get something for my hypoglycemia.  My brother also told him that I was having a seizure and an episode."  Defendant, in response, "called me crazy," "told the other officers that I was a crazy one," and "forced me to be in handcuffs and in the back of the van while I was having a seizure."  (Pl.'s Discovery Responses at Interrogatories 7, 8, 10.)  Plaintiff's letter states that while he was detained by Defendant and Ms. Tenner, he insisted that he "never intended to steal" the glasses, but nevertheless "opted for them to call the police" because "all [he] want[ed] [was] to get out of there and get [his] insta-glucose gel and eat something."  (Letter to Dr. Rebong at 3.)

At some point thereafter a police "wagon responded to Shaw's and transported [Plaintiff] to [headquarters] for booking" by a non-party officer.  (Incident and Offense Report, Ex. C to Def.'s Mem. Supp., at 2.)[2]  The unrebutted record is that Defendant knew

---

[2] Plaintiff's letter to Dr. Rebong details his symptoms in the police van.  It states:

When the policeman arrived and change[d] the [h]andcuffs and [was] about to put me inside the police van, I felt twitching from my neck down to my

4

Plaintiff claimed to be suffering from hypoglycemia and that in response to Plaintiff's symptoms and repeated requests for assistance Defendant called Plaintiff "crazy" and did not provide him any medical care or permit him to get his insta-glucose gel or anything to eat.

Plaintiff states that "[t]he [criminal] case against [him] was dismissed [on] Dec[ember] 16, 2005." (Letter to Dr. Rebong at 5–6.) Plaintiff proffers records from the Waterbury Police Department listing the "Court Disp[osition]" of his case as "DISMISSED" and a "Dispo[sition] Date" of "12/16/2005." (Mugshot, Ex. D. to Pl.'s Rule 56(a)2 Stmt., at 2.) Defendant claims that the criminal proceedings did not terminate in Plaintiff's favor, pointing to Superior Court records listing Plaintiff's charge as larceny in the sixth degree with three hand-written and stamped notes ("plea vacated," "dismissed," and "Conditional Plea to 12/16 Dismissal") and four dates ("10/02/2005," "Dec. 16[,] 2005," "Nov. 18[,] 2005" (twice), and "11-18"). (Ex. E to Def.'s Mem. Supp., at 2.)

---

> right arm and the policeman says "I don't have to tell you more than once to stop that" not knowing that I'm having a sort of diabetic seizure. On the way to the precinct . . . I was feeling very sick and nauseous inside the van. . . . Everything I could see was blurry and dark. . . . The policeman said only those who have or use[] a cane are considered blind. When I was placed in the holding cell, I told the policewoman who was interviewing me and getting bio-data from me that I have to get out [of] there and go to my car to get my insta-glucose gel because I'm having hypoglycemia. The policeman who brought me in made a circling motion with his hand on his head and said 'yeah all of us wants to be out there[.]' . . . When the police officer was taking my mug shot, he told me to open my eyes wide, I told him I can't because of my ptosis. When he was fingerprinting me I was shaking and regurg[itating] but nothing would come out because I'm empty. He yelled at my saying 'you crazy don't throw up on me.' . . . By then stupor seem[s] to be setting on in me. I was more confused, mortified and frustrated of letting them know I'm not feeling well.

(Letter to Dr. Rebong at 3–4 (paragraph breaks omitted).)

II.   Discussion³

    A.   False Arrest and Malicious Prosecution

Under 42 U.S.C. § 1983 a plaintiff must demonstrate that he was subjected to the "deprivation of a[] right[], privilege[], or immunit[y] secured by the Constitution and laws" of the United States. "The common law tort of false arrest is cognizable under § 1983 only if it also encompasses a violation of federal statutory or constitutional law." *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995). The absence of probable cause is a necessary element of a false arrest claim, and if a plaintiff's arrest was supported by probable cause his claim must fail. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted) ("The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983."); *Beinhorn v. Saraceno*, 23 Conn. App. 487, 491 (1990) (absence of probable cause is an element of a false arrest claim). Probable cause is also an element of Plaintiff's § 1983 malicious prosecution claim. *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) (to make out malicious prosecution claim a plaintiff must establish both the elements of malicious prosecution under state law, and his deprivation of a Fourth Amendment right); *Bhatia v. Debek*, 287 Conn. 397, 404 (2008) (quoting *McHale v. W.B.S. Corp.*, 187 Conn. 444, 447 (1982)) (listing elements of malicious prosecution claim in Connecticut, including that "the defendant acted without probable cause").

---

³ The well-known summary judgment standard is familiar to the Court and will be applied without recitation in detail. *See, e.g.*, *Rogers v. Apicella*, 606 F. Supp. 2d 272, 284–85 (D. Conn. 2009) (articulating summary judgment standard); *see also Roe v. City of Waterbury*, 542 F.3d 31, 35–36 (2d Cir. 2008) (same).

Where parties dispute what facts were known to police officers at the time an individual was arrested, resolution is for the jury; where, however, the dispute is whether a particular set of facts supports probable cause, the disposition is a matter of law. *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court."). By its nature an inquiry into the existence of probable cause is fact-specific: "[i]n general, probable cause . . . exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852; *see also Walczyk*, 496 F.3d at 156–57; *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000).

Plaintiff concedes that Defendant initially had probable cause to arrest him when he saw him leave the store without paying for the glasses, but argues that after Defendant "learned that the plaintiff had suffered a severe hypoglycemic attack that had forced him to retreat to his automobile for potentially life-saving procedures," the "initial probable cause" was "neutralized," such that "by the time of the arrest," probable cause no longer existed. (Pl.'s Opp'n at 10–11.) Defendant argues that he had probable cause to arrest Plaintiff for Larceny in the Sixth Degree in light of Plaintiff's admission that he left the store without paying for the glasses, which Defendant observed as it was happening (Def.'s Mem. Supp. [Doc. # 21-1] at 4, 12, 16), and it is immaterial that Plaintiff left the store in a "panicked" state, his hypoglycemic attack was severe, and he intended to ask his brother to return to the store and pay for the glasses but was detained and arrested before he could do so. Plaintiff's own rendition of events makes no association between his hypoglycemic attack and his

7

decisions to remove the glasses' tag or to put the glasses in his back pocket. Moreover, under the Connecticut larceny statute "[a] person intentionally concealing unpurchased goods or merchandise of any store or other mercantile establishment, either on the premises or outside the premises of such store, shall be prima facie presumed to have so concealed such article with the intention of converting the same to his own use without paying the purchase price thereof." Conn. Gen. Stat. § 53a-119(9). Thus Officer Torres, having observed on the store's closed-circuit television Mr. Estrada remove the tag and put the glasses in his back pocket, had probable cause to arrest Mr. Estrada for larceny before Mr. Estrada left the store. *See also Bacci v. Fairway Market*, No. 06 Civ. 2407(DAB), 2008 WL 2139132, *7 (S.D.N.Y. May 19, 2008) (granting defendant police officers summary judgment on false arrest claim on closely analogous facts because "the Police Officers who responded to Fairway Market plainly had sufficient probable cause to arrest Plaintiff for petit larceny and possession of stolen property based on [a Fairway employee's] report since [the employee] had personally witnessed Plaintiff attempting to leave the supermarket with un-purchased goods concealed on his person").

In essence, then, Plaintiff's argument is that Officer Torres, knowing of Mr. Estrada's oncoming hypoglycemic attack, should have determined that Mr. Estrada had left the store because of a medical emergency and without intent to steal the glasses. Plaintiff points out that in *Kerman v. City of New York* the Second Circuit approvingly quoted the proposition that "'[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence,'" 261 F.3d 229, 241 (2d Cir. 2001) (quoting, in a parenthetical, *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)), in holding that police are not entitled to qualified immunity if they arrest and hospitalize a person they suspect is mentally ill and poses a danger to

8

himself or others if they "fail[] to reasonably investigate his mental state" and "grossly misjudge[] the situation as it unfold[s] before them," 261 F.3d at 241.[4]

Plaintiff's argument must fail. First, Plaintiff's hypoglycemia and his assertions of innocence are not "plainly exculpatory evidence." Instead, onset of Plaintiff's hypoglycemia is not inconsistent with the actions that gave rise to probable cause, and indeed Plaintiff could have both intended to steal the glasses and also had hypoglycemia, *see D'Angelo v. Kirschner*, 288 F. App'x 724, 725–26 (2d. Cir. 2008) ("that an innocent explanation 'may be consistent with the facts alleged does not negate probable cause'") (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)), and "[i]t is up to the factfinder to determine whether a defendant's story holds water, not the arresting officer." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989).

Second, here, unlike in *Kerman*, state law provides a prima facie presumption that Plaintiff, having taken the actions Defendant observed, had committed a crime. *See* Conn. Gen. Stat. § 53a-119(9). Thus, Officer Torres was not confronted by the constitutional obligation to determine whether Plaintiff "presented a threat to himself or others," the fact-

---

[4] In *Kerman*, the court held that the defendant officers were not entitled to summary judgment or qualified immunity because they relied on an anonymous and uncorroborated 911 call informing them that "a mentally ill man at [the apartment's] location was off his medication and acting crazy and possibly had a gun," but disregarded what Kerman described as his being "calm during most of his encounter with the police" and an "apartment [that] was, at worst, untidy." Moreover, "the officers deliberately ignored two opportunities to confirm the seriousness of Kerman's condition"—two calls to Kerman's apartment while they were there, one by Kerman's girlfriend, who identified herself as the anonymous 911 caller and sought to speak with Kerman, and one from the psychiatrist overseeing the study pursuant to which Kerman had stopped taking his medication. *Kerman*, 261 F.3d at 233, 241. The court held that "a fact-finder could well find that the police acted outside the bounds of both the Fourth Amendment and the qualified immunity standards of objective reasonableness in placing Kerman in restraints for his eventual transport to [the hospital]." *Id.*

specific inquiry incumbent on the officers in *Kerman* before they could forcibly hospitalize Kerman. *Compare Kerman*, 261 F.3d at 241 ("the police may have been entitled to hospitalize Kerman if his conduct or the condition of his apartment demonstrated a dangerous mental state"), *with Krause*, 887 F.2d at 371 (citation omitted) ("It bears repeating that probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful. 'It is therefore of no consequence that a more thorough or more probing investigation might have cast doubt upon' the situation.").

Finally, unlike in *Kerman*, where third parties and the officers' own observations of Kerman's demeanor and apartment provided the information disregarded by the officers, here the claimed exculpatory evidence was simply two assertions by the same person for whom probable cause to arrest existed. This distinction renders *Kerman* inapposite, for it is clear that having had probable cause to arrest Plaintiff, Officer Torres was not required to assess whether Plaintiff's hypoglycemic attack or his protestation of innocence sufficed to negate Plaintiff's presumptive intent to commit larceny before taking him into custody. An "officer [i]s not required to make a full investigation into plaintiff's state of mind prior to taking action. Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997); *see also Krause*, 887 F.2d at 372.

Even though Plaintiff was apparently not convicted of larceny in the sixth degree,[5] there is a wide gulf between the facts necessary to establish probable cause and those necessary to establish guilt beyond a reasonable doubt, and "[o]nce officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury." *Krause*, 887 F.2d at 372; *see also State v. Johnson*, 286 Conn. 427, 435 (2008) ("The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence. . . . The probable cause determination is, simply, an analysis of probabilities") (quotation and citation omitted).

Plaintiff points to no evidence in the record of any exculpatory information Officer Torres learned after Mr. Estrada's arrest but before or during his prosecution that altered the probable cause analysis above. As an initial matter, on the uncontested record Defendant learned of Plaintiff's hypoglycemia and protestations of innocence *prior to*, rather than *after*, arresting him. Nonetheless, at oral argument Plaintiff argued that courts err when they conflate probable cause to arrest (for purposes of determining the legal merit of a false arrest claim) with probable cause to prosecute (when considering a malicious prosecution claim), but this argument misreads both Second Circuit precedent and Connecticut law. In *Posr v. Court Officer Shield No. 207*, the Second Circuit explained that because "under New York law," a plaintiff seeking to establish a claim of malicious prosecution must demonstrate, *inter alia*, "that the defendant lacked probable cause to believe the proceeding could *succeed*,"

---

[5] Because the Court concludes that Defendant had probable cause to arrest and prosecute Plaintiff, Plaintiff's false arrest and malicious prosecution claims fail without the Court needing to determine whether the criminal proceedings against Plaintiff terminated in his favor.

11

probable cause to arrest and "probable cause to believe the proceeding could succeed" were not "interchangeable." 180 F.3d 409, 417 (2d Cir. 1999). In *D'Angelo*, however, the Second Circuit made clear that in light of the elements of a malicious prosecution in *Connecticut*, "[o]rdinarily, in the absence of exculpatory facts which became known after an arrest, probable cause to arrest is a complete defense to a claim of malicious prosecution." *D'Angelo*, 288 F. App'x at 726 (citing *McHale*, 187 Conn. at 447 (listing elements of malicious prosecution claim in Connecticut) and *Johnson v. Ford*, 496 F. Supp. 2d 209, 214 (D. Conn. 2007)).[6] As explained above, Plaintiff's hypoglycemia and his assertion that he did not intend to steal the glasses are neither "exculpatory facts" nor "facts which became known after an arrest," and so they do not undercut the "complete defense to a claim of malicious prosecution" provided by Officer Torres's probable cause to arrest Plaintiff. In any case, given the prima facie presumption of intent to steal that inhered in the actions Officer Torres observed Mr. Estrada take, probable cause existed not only to arrest Plaintiff, but also to prosecute him. Probable cause having existed both to arrest and to prosecute Mr. Estrada for larceny in the sixth degree, summary judgment must be granted to Defendant on Plaintiff's claims of false arrest and malicious prosecution.

    B.    Excessive Force

"[A]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest . . . [must] be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in

---

[6] *D'Angelo* also held that where a plaintiff claiming false arrest and malicious prosecution had been prosecuted for *more than one crime*, probable cause to arrest him for *one crime* does not defeat his malicious prosecution claim *as to the other crimes*, *D'Angelo*, 288 F. App'x at 726–27, but here Plaintiff was arrested and prosecuted for only one crime: larceny in the sixth degree.

original). Plaintiff claims that Defendant used excessive force in handcuffing him and patting him down by pulling on his pants.[7] Defendant argues both that the force he used is not excessive as a matter of law, and also that he is entitled to qualified immunity.

Because Officer Torres does not dispute Plaintiff's rendition of the facts regarding his use of force in arresting him, there is no issue as to any fact material to Plaintiff's excessive-force claim or Defendant's claim to qualified immunity. Where "there is no

---

[7] In his deposition Plaintiff listed as "excessive" only the pat-down:

Q: . . . Can you explain for me what instances you were subjected to the use of force here?

A: I wouldn't say 'force,' but things weren't given to me that were supposed to, like medical attention I needed so bad; and force, except for the security guard pulling my pants about five times. I don't know why he's doing it, and it hurts my groin. He's doing it and my pants weren't even falling down. He's doing it. He patted me several times, took all my possessions and everything and accused me of stealing the glasses, the dark glasses, which I need because of my ptosis and the sun. It was a sunny day, October 2nd.

(Pl.'s Dep. at 51:21–8.) Plaintiff then confirmed that the pat-down was "the only instance that [he] could perceive as force being used on [him]," and when asked a third time to describe the force "[i]n a physical sense" used against him by Officer Torres he listed only "[b]eing yelled at" and "the tone of [his] voice," which "[h]e raised." (Id. 52:12–17.) In his sworn discovery responses Plaintiff adds that Defendant's handcuffing him was also excessive:

Interrog. 10: . . . Please describe with specificity the force used by the Defendant Officer.

Answer: He forced me to be in handcuffs and in the back of the van while I was having a seizure. When I left the van, I could not see the ramp that I had to walk down. He was sarcastic and telling me to open my eyes when I could not open my eyes because of my ptosis.

(Pl.'s Discovery Responses at Interrogatory 10.)

dispute about the material facts, the district court should assess the reasonableness of the defendants' conduct under the circumstances presented in order to determine on summary judgment whether the defendants are entitled to qualified immunity." *Lennon*, 66 F.3d at 421. The doctrine of qualified immunity would protect Defendant if "(1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established constitutional right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citations omitted). The right under the Fourth Amendment to be free from excessive force was clearly established in October 2005, *Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991) ("[t]he right of an individual not to be subjected to excessive force is well established"), so in order to determine whether Officer Torres is entitled to qualified immunity the Court must determine whether "it was objectively reasonable for [him] to believe that" his handcuffing, arms-raising, and patting-down of Plaintiff "did not violate [that] right," *Lennon*, 66 F.3d at 423. This would be the case if "no rational jury could have found that the force used was so excessive that no reasonable officer would have made the same choice." *Id.* 426.

"[N]ot every push or shove constitutes excessive force." *Lennon*, 66 F.3d at 426 (citing *Graham*, 490 U.S. at 396). It was objectively reasonable for Defendant to believe that his handcuffing and pat-down of Plaintiff were not excessive, especially after Defendant observed Plaintiff remove the tags from one item for sale, place it in his pants pocket, and leave the store without paying for it. Not only does "the right to make an arrest . . . *necessarily* carr[y] with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham*, 490 U.S. at 396 (emphasis added), but officers are entitled to "search [an] arrestee's person and the area . . . from within which he might gain possession of . . .

14

destructible evidence," *Chimel v. California*, 395 U.S. 752, 763 (1969).[8]  No reasonable jury could conclude that *no* reasonable officer would handcuff and pat down Plaintiff in the manner done by Defendant.  Because given the undisputed facts of this case "it was 'objectively reasonable' for [Officer Torres] to believe his conduct did not violate a clearly established constitutional right," Defendant is entitled to qualified immunity as to Plaintiff's claim of excessive force.  *Hartline*, 546 F.3d at 102.

IV.     Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment [Doc. # 20] is GRANTED.  Plaintiff's claim of denial of proper medical care remains for trial.


IT IS SO ORDERED.

 /s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 24th day of July, 2009.

---

[8] Under *Chimel* Plaintiff's assertion that "my pants weren't even falling down" when Officer Torres patted him down (Pl.'s Dep. at 52:4) is irrelevant in considering the reasonableness of Defendant's pat-down or yanking of Plaintiff's pants.